IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| IN RE SOURCEFIRE, INC. SECURITIES LITIGATION | * * * * * * * * ***** | Civil No. JFM 07-1210 |

**MEMORANDUM OPINION**

This putative securities class action arises out of the initial public offering of Sourcefire, Inc., a technology company that provides "open source network security solutions" to a variety of public and private entities. (Am. Compl. ¶ 6.) Lead plaintiff Sandra Amrhein has brought suit against a variety of persons related to the initial public offering as well as the company itself. (*Id.* ¶¶ 15–34.) Plaintiff alleges violations of Sections 11, 12, and 15 of the Securities Act of 1933. (*Id.* ¶ 5.) Defendants have filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Defendants' motion will be granted in part and denied in part.

**I.**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead plausible, not merely conceivable, facts in support of her claim. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct.

---

[1] The main motion to dismiss was filed by the so-called "Sourcefire Defendants" and defendant Sierra Ventures VII, L.P. The "Sourcefire Defendants" include the company and its directors. (Sourcefire Defs.' and Def. Sierra Ventures VII, L.P.'s Mot. to Dismiss. at 11.) This motion to dismiss was adopted and expanded upon by the so-called "Underwriter Defendants", including Morgan Stanley & Co., Jeffries & Co., Inc., Lehman Brothers, Inc., and UBS Securities, LLC. (*See* Am. Compl. ¶¶ 30–34.) The Motion to Dismiss of the Sourcefire Defendants and Sierra Ventures VII, L.P. will be hereinafter referred to as "Defs.' Mot. to Dismiss." The Underwriter Defendants' Motion to Dismiss is not cited.

1955, 1974 (2007). The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965. Of course, the court must "accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff." *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001).

To establish a prima facie case under sections 11 and 12 of the Securities Act of 1933, "a plaintiff need only show that he purchased a security issued pursuant to a registration statement or prospectus containing a material misstatement or omission." *Recupito v. Prudential Secs., Inc.*, 112 F. Supp. 2d 449, 454 (D. Md. 2000) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). For a misstatement or omission to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

While issues of materiality can be decided at the motion to dismiss stage as a matter of law, *see Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 657 (4th Cir. 2004), such dispositions are disfavored in light of the fact-intensive nature of the materiality inquiry, *see Dunn v. Borta*, 369 F.3d 421, 427 (4th Cir. 2004) ("[W]e are mindful that, 'in general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss.'") (quoting *Bielski v. Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir. 2002)). Under these standards, I will examine defendants' motion to dismiss.

## II.

Sourcefire carried out an initial public offering ("IPO") on March 9, 2007. (Am. Compl.

¶ 7.)  The events preceding and following the IPO form the basis for plaintiff's suit.  In advance of the IPO and in accordance with its legal obligations, Sourcefire filed a Prospectus with the Securities and Exchange Commission.  (*Id.* ¶ 5.)  Because the substance of the Prospectus is dispositive of the instant motion, I will quote extensively from it here:[2]

> Revenue from [Sourcefire] product sales has been highly seasonal, with more than one-third of our total product revenue in recent fiscal years generated in the fourth quarter. . . . .  Revenue from our government customers has occasionally been influenced by the September 30th fiscal year-end of the U.S. federal government, which has historically resulted in our revenue from government customers being highest in the third quarter.  Although we do not expect these general seasonal patterns to change substantially in the future, our revenue within a particular quarter is often affected significantly by the unpredictable procurement patterns of our customers. . . . Historically, many of our customers have not finalized their purchasing decisions until the final weeks or days of a quarter.  We expect these purchasing patterns to continue in the future.  Therefore, a delay in even one large order beyond the end of the quarter could materially reduce our anticipated revenue for a quarter.  Because many of our expenses must be incurred before we expect to generate revenue, delayed orders could negatively impact our results of operations for the period and cause us to fail to meet the financial performance expectations of securities industry research analysts or investors.

(Def.'s Mot. to Dismiss Ex. A, Sourcefire Prospectus at 33–34.)

> Our product revenue has tended to be seasonal.  In our third quarter, we have historically benefitted from the Federal government's fiscal year end purchasing activity.  This increase has been partially offset, however, by European sales, which have tended to decline significantly in the summer months due to the practice by many Europeans of taking extended vacation time and delaying capital purchase activities until their return in the fall.  We have historically generated a significant portion of product revenue in the fourth quarter due to the combination of increased activity in Europe coupled with North American enterprise customers who often wait until the fourth quarter to extract favorable pricing terms from their vendors, including Sourcefire.

(*Id.* at 49.)

> Our operating results have historically varied significantly from period to period, and we expect that they will continue to do so as a result of a number of factors, most of which

---

[2] I can properly consider the Prospectus at this stage of the litigation.  *See, e.g.*, *Recupito*, 112 F. Supp. 2d at 453 (observing that a court can consider such documents without "converting the motion to dismiss into a motion for summary judgment").

>are outside our control, including . . . the timing, size and contract terms of orders received, which have historically been highest in the fourth quarter (representing more than one third of our revenue in recent years), but may fluctuate seasonally . . .

(*Id.* at 10.)

>On a quarterly basis, we have usually generated the majority of our product revenue in the final month of each quarter. We believe this occurs for two reasons. First, many customers wait until the end of the quarter to extract favorable pricing terms from their vendors, including Sourcefire. Second, our sales personnel, who have a strong incentive to meet quarterly sales targets, have tended to increase their sales activity as the end of a quarter nears, while their participation in sales management review and planning activities are typically scheduled at the beginning of a quarter.

(*Id.* at 49.)

On March 9, 2007, Sourcefire issued 5,770,000 shares of common stock pursuant to its IPO. (Am. Compl. ¶ 7.) The stock sold at the price of $15.00 per share. (*Id.*) On April 6, 2007, nearly a month after the IPO, Sourcefire issued a press release alerting the financial community that its first quarter results were "estimated to be in the range of $10.1 to 10.5 million." (*Id.* ¶ 9.) These results were apparently a disappointment, as Sourcefire's stock price dropped from $17.75 a share on April 5, 2007 to $12.28 a share on April 9, 2007.[3] On April 9, 2007, Sourcefire issued another press release which stated: "Historically, the first calendar quarter has been the slowest quarter of the year . . ." (*Id.* ¶ 12.) The price of Sourcefire stock has not recovered, and was recently trading at a price of under $6.00 a share. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 7.)

### III.

Plaintiff alleges that omissions in the Prospectus constitute violations of Sections 11, 12, and 15 of the Securities Act of 1933. In particular, plaintiff alleges that the Prospectus omitted the following facts: (1) that "sales of its products to the federal government had materially

---

[3] As April 6, 2007 was Good Friday, the markets were closed. (Am. Compl. ¶ 9.) Accordingly, April 9, 2007 was the next trading day after the first press release. (*Id.* ¶ 12.)

decreased and as such, revenues from the federal government component of its business had materially decreased; and (2) . . . that its first calendar quarter has historically been the Company's slowest quarter." (Am. Compl. ¶ 14.) Plaintiff argues that these two alleged omissions are material, and thus the requisite *prima facie* case has been made. Plaintiff's first claim will survive this motion to dismiss, *see infra* § III(A), but plaintiff's second claim will be dismissed, *see infra* § III(B).

### A.

Plaintiff's first claim is that, as of the date of the IPO, "sales of [Sourcefire's] products to the federal government had materially decreased and as such, revenues from the federal government component of its business had materially decreased." (Am. Compl. ¶ 14(a).) Defendants respond with two arguments. First, they point out that companies need not usually release mid-quarterly data, even in advance of an IPO and in light of revenue downturns. Second, defendants contend that there was no material omission because the Prospectus fully disclosed and cautioned about the risk that ultimately came to fruition.

With respect to defendants' first argument, it is undoubtedly true that companies are not usually under an obligation to release mid-quarterly financial information in advance of an IPO. *See, e.g.*, *Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D. N.J. 1995) ("Plaintiff argues that because [the company's] Prospectus/Registration Statement became effective less than three days before the close of the fiscal quarter, information must have been available and that [the company] was required to disclose it. The existence of such an obligation is inconsistent with [prior case law]."); *id.* at 1016 ("Regardless of whether a public offering occurs seventeen or only two days before the close of a fiscal quarter, data concerning a quarter that is in progress is

necessarily incomplete.").

However, it is important to clarify what exactly plaintiff alleges: namely, that defendants possessed sufficient information at the time of the IPO about decreased orders from the government to render the decision not to release mid-quarterly data a material omission. A similar claim was found to be cognizable in *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1206 (1st Cir. 1996). There, the plaintiffs alleged "that, by the date of the [public offering], defendants were in possession of, yet failed to disclose, material knowledge of facts indicating that the third fiscal quarter would be an unexpectedly disastrous one." *Id.* The First Circuit found that such allegations could survive a motion to dismiss because the issue of "whether the nondisclosure of interim facts rendered the prospectus incomplete" was a disputed question of fact. *Id.* at 1210. In particular, the First Circuit stated:

> Present, known information that strongly implies an important future outcome is not immune from mandatory disclosure merely because it does not foreordain any particular outcome. The question whether such information must be disclosed . . . poses a classic materiality issue: given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?[4]

*Id*.

While it is quite possible that the existence of a low revenue stream midquarter was not a

---

[4] In *Shaw*, 82 F.3d at 1210–1211, the First Circuit did not adopt a bright line rule against dismissal of such claims, and pointed out that "[i]n many circumstances, the relationship between the nonpublic information that plaintiffs claim should have been disclosed and the actual results or events that the undisclosed information supposedly would have presaged will be so attenuated that the undisclosed information may be deemed immaterial as a matter of law." Indeed, in the later case *Glassman v. Computervision Corp.*, 90 F.3d 617, 631–632 (1st Cir. 1996), the First Circuit found that plaintiffs' claim that defendants failed to disclose negative midquarterly financial information was properly dismissed. *Id.* ("That quarterly results for the third quarter of 1992 did in fact turn out to be lower than expected is not enough to produce the inference that as of the offering date [the company] had hard mid-quarter results that would have predicted a material departure in the end-of-quarter results."). I note, however, that this dismissal was not ordered until after discovery had been completed. *Id.* at 621–622.

material fact that Sourcefire had to disclose, it is also possible that such reduced revenue might have been material.  Resolution of the question requires development of a factual record about what the defendants knew, when they knew it, and how substantial the known information was.  This is a classic case where materiality, on the face of the complaint, is neither self-evident nor self-evidently nonexistent.

Defendants' second argument is that the Prospectus provided sufficient information for the "bespeaks caution" doctrine to apply.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 15.)  The "bespeaks caution" doctrine dictates that alleged "misrepresentations and omissions . . . must be considered in the full context in which they were made.  Cautionary language in an offering document may negate the materiality of an alleged misrepresentation or omission."  *Gasner v. Bd. of Supervisors of the County of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996) (internal citations omitted).

Defendants emphasize that the Prospectus repeatedly warned that Sourcefire's business fluctuated, that quarterly revenues would vary in light of the timing of major orders, and that orders were often made in the waning days of a quarter.  (*See, e.g.*, Defs.' Mot. to Dismiss Ex. A, Sourcefire Prospectus at 10 ("Our operating results have historically varied significantly from period to period . . ."); *id.* at 34 (" . . . [D]elayed orders could negatively impact our results of operations for the period and cause us to fail to meet the financial performance expectations of securities industry research analysts or investors."); *id.* at 49 ("On a quarterly basis, we have usually generated the majority of our product revenue in the final month of each quarter.").)  This information, defendants contend, is sufficient for the bespeaks caution doctrine to apply, thus requiring dismissal of plaintiff's claim.

However, cautionary language cannot be used as a shield against all liability; the bespeaks caution doctrine does not operate to protect defendants who fail to disclose *known material facts*. Rather, the use of cautionary language is best seen as merely "relevant to the materiality inquiry, for such inclusion or disclosure [of cautionary language] is part of the 'total mix of information.'" *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994). Usually, "cautionary language as such is not per se dispositive of this inquiry," *id.*, and dismissals based on the bespeaks caution doctrine generally are limited to cases where the complaint attempts to turn economic forecasts or corporate goals into actionable misrepresentations. *See, e.g.*, *Shaw*, 82 F.3d at 1213 ("[The bespeaks caution doctrine] embodies the principle that when statements of 'soft' information such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, the 'soft' statements may not be materially misleading under the securities laws."). This is so because the doctrine has its roots in the fact that the securities laws provide less regulation of forward-looking statements than declaratory statements of fact. *See, e.g.*, *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) ("Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance.") (emphasis in original).

*Milman v. Box Hill Systems Corp.*, 72 F. Supp. 2d 220 (S.D.N.Y. 1999), is instructive here. In *Milman*, the plaintiff alleged that at the time of the stock offering, the company had lost "several key customers" and, "[a]s a result, [its] sales were materially declining." *Id.* at 231. The court found that this allegation did state a claim despite the presence of extensive cautionary language in the Prospectus, *id.* at 232, making clear that such language cannot shield defendants

from liability for failure to disclose known material facts:

> The Prospectus does make extensive disclosure regarding the risky and volatile competitive environment for [the company's] products and services. The Prospectus minimizes neither the competency and resources of [the company's] primary competitors, nor [the company's] dependence upon a small concentration of customers in specific industries. However, the Prospectus does not reveal that sales were in material decline at the time of the Offering. Once again, *hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge*."

*Id.* at 231 (emphasis added).

In short, there is a difference between language bespeaking caution of hopeful corporate predictions and the failure to disclose known material facts and data. *See, e.g.*, *Rubinstein*, 20 F.3d at 171 ("[T]he inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."). Thus, the bespeaks caution doctrine is not dispositive as a matter of law.

**B.**

Plaintiff's second claim is that defendants failed to disclose that the first calendar quarter had historically been Sourcefire's weakest. (Am. Compl. ¶ 14(b).) This argument fails to state a claim not because the alleged omission was immaterial, but because there was, in fact, no omission at all. As I have previously stated in a different but analogous context: "The premise of § 11 is that prospective investors will read a prospectus. Anyone who took the time to read the prospectuses . . . with even minimum care would certainly have been alerted to the" substance of the alleged omission. *In re RAC Mortgage Inv. Corp. Secs. Litig.*, 765 F. Supp. 860, 865 (D. Md. 1991).

Here, plaintiff asks: "If defendants knew that the first quarter was the weakest, why did they not just say so?" (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 14.) The short answer to this

question is that defendants *did* say so, just not in the precise terms that plaintiff now, in hindsight, demands.  In particular, the Prospectus included the following:

- A detailed chart documenting Sourcefire's revenue, and other financial data, for each quarter for the years 2005 and 2006;
- Repeated references to the seasonality of Sourcefire's business; and
- Repeated references to the strength of Sourcefire's third and fourth quarters.

(Defs.' Mot. to Dismiss Ex. A, Sourcefire Prospectus at 48; *id.* at 33–34, 49; *id.* at 33, 49.) From this information, any reasonable investor could have at least deduced that the first quarter was one of the two weakest quarters, and an investor who considered the quarterly data in the aforementioned chart could have concluded that the first quarter had recently been the weakest.

At root, plaintiff's complaint is that the Prospectus did not use particular language.  Yet the securities laws do not mandate the use of magic words, and Sourcefire's inclusion of data demonstrating the relative weakness of the first quarter, as well as repeated descriptions of the seasonality of the business, is more than sufficient to render the alleged omission no omission at all.  Accordingly, defendants' motion to dismiss will be granted with respect to this claim.

**IV.**

Defendants' final argument is that plaintiff has failed to state a claim for control person liability under Section 15 of the Securities Act.  According to defendants, plaintiff "fails to state a claim under Section 15 because she does not allege sufficient facts to demonstrate that the individual defendants had the power to exercise control over the operations of Sourcefire." (Defs.' Mem. in Supp. of Mot. to Dismiss at 22.)  For the following reasons, defendants' motion to dismiss on this basis will be denied.

Section 15 states:

Every person who, by or through stock ownership, agency, or otherwise, or who,

-10-

>   pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [sections 11 and 12 of the Act], shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

Here, plaintiff avers that each of the individual defendants was "a control person of Sourcefire by virtue of his or her position as a director and/or senior officer of Sourcefire. The Individual Defendants each had a series of direct and/or direct indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Sourcefire." (Am. Compl. ¶ 73.) Additionally, in summarizing the identity of the parties, plaintiff notes that each of the individual defendants was either a director or officer of Sourcefire and signed or authorized the signing of the offering documents. (*Id.* ¶¶ 17–26.)

Such facts are sufficient to carry the control person claim past the motion to dismiss stage. On this point, I am in agreement with Judge Blake, who concluded under comparable circumstances that "plaintiffs are not required to allege 'culpable participation' beyond the facts of control and the underlying violation by the controlled person in order to state a claim." *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d 334, 408 (D. Md. 2004) (Blake, J.). Plaintiff has alleged an underlying violation of sections 11 and 12. Discovery must be taken to determine whether under the non-exhaustive list of facts relevant to the question of control recited in Section 15, *see* 15 U.S.C. § 77o (listing "stock ownership, agency, . . . or in connection with an agreement or understanding with one or more other persons" as relevant factors), plaintiff can establish the element of control, *see In re Royal Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d at 409 (observing that "determining whether an individual is a control person

presents a 'complex factual question'") (quoting *SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir. 1974)).  Accordingly, defendants' motion to dismiss Count III of the Amended Complaint will be denied.

A separate order effecting the rulings made in this Memorandum Opinion is being entered herewith.


April 23, 2008                                    /s/_____
                                                  J. Frederick Motz
                                                  United States District Judge